**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**BRIAN KEITH RUNYON,**

      **Plaintiff,**

**v.**                                **Case No.: 2:16-cv-09668**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties cross motions for judgment on the pleadings, as articulated in their memoranda. (ECF Nos. 12, 13).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 12), to the extent that it

requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

## I.    <u>Procedural History</u>

On May 13, 2009, Plaintiff Brian Keith Runyon ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of November 1, 2008, (Tr. at 169-174), due to "loss of left arm, right foot injury, lower back injury, arthritis in joints, anxiety and depression." (Tr. at 209). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 82-91, 95-100). Claimant filed a request for an administrative hearing. (Tr. at 101-02). However, without a hearing, the Administrative Law Judge, David B. Daugherty ("the prior ALJ"), issued a decision on March 30, 2010 finding that Claimant was disabled beginning on his alleged onset date. (Tr. at 67-75).

By letter dated May 18, 2015, the SSA notified Claimant that it had reason to believe that fraud was involved in certain cases prosecuted by Claimant's attorney, Eric Conn, which included evidence from, *inter alia*, Frederic Huffnagle, M.D. (Tr. at 18, 120). The Appeals Council determined that the prior ALJ's decision was not supported by a preponderance of the remaining evidence after it excluded the evidence submitted by Dr. Huffnagle in Claimant's case. (Tr. at 18). Therefore, the Appeals Council remanded Claimant's case for "redetermination" by an ALJ. (Tr. at 76-80). On remand, the ALJ was to disregard the evidence from Dr. Huffnagle and issue a new decision on the issue of disability through March 30, 2010, the date of the prior ALJ's decision. (Tr.

at 79-80). Claimant was permitted to submit additional evidence or statements in support of his original applications for benefits.[1] (Tr. at 76-77).

On March 7, 2016, Claimant had a hearing before the Honorable L. Raquel Bailey Smith, Administrative Law Judge ("the ALJ"). (Tr. at 40-62). By written decision dated May 27, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 18-33). The ALJ's decision became the final decision of the Commissioner on August 19, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Memorandum in Support of Judgment on the Pleadings. (ECF No. 12). In response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 13). Claimant requested an extension of time in which to file his reply brief and was given an extension through April 12, 2017. (ECF Nos. 14, 15). However, Claimant did not file a reply memorandum, and the time for filing one has long since expired. Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 37 years old at the time of his alleged onset of disability and 44

---

[1] SSR 16-1P, 2016 WL 1029284 (S.S.A. Mar. 14, 2016), provides guidance as to how the SSA redetermines eligibility for benefits when there is a reason to believe fraud was involved with an individual's application for benefits. Upon redetermination, the SSA disregards any fraudulent evidence and considers the remaining evidence provided about the claimant's eligibility for benefits, even if such evidence was not supplied with the claimant's initial application, or post-dates the prior ALJ's decision, so long as the evidence relates to whether the claimant was disabled at the time of the prior ALJ's decision. *Id.* at *5. As the SSA only considers the claim through the prior ALJ's decision, it does not develop evidence about impairments that arose after the prior decision. *Id.* A claimant can appeal an adverse redetermination decision. *Id.*

3

years old at the time of the ALJ's decision. (Tr. at 19). He has the equivalent of a high school education and communicates in English. (Tr. at 208, 214). Claimant previously worked as a heavy equipment operator in the mining industry. (Tr. at 48, 210).

### III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the

limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d),

416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 30, 2010, the date of the prior ALJ's decision, and had a date last insured of December 31, 2012. (Tr. at 22, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant engaged in substantial gainful activity from November 1, 2008 through July 11, 2009, but did not engage in substantial gainful activity from July 11, 2009 through March 30, 2010, the

date of the prior ALJ's decision. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had no severe impairments, but had the following non-severe medically determinable impairments: status post left arm amputation, right wrist drop with the radial nerve entrapment across the spiral groove, right carpal tunnel syndrome, and major depressive disorder. (*Id.*, Finding No. 3). The ALJ also considered Claimant's right foot injury, lower back injury, anxiety, nervousness, and insomnia, but concluded that there was no record of a diagnosis of such alleged impairments from an acceptable medical source. (*Id.*). The ALJ further found that the record contained diagnoses of right hand/arm pain; cervical radiculopathy/strain/pain; and atrophy, but these diagnoses were made by a nurse practitioner, who likewise was not an acceptable medical source. (*Id.*). Finally, the ALJ noted that the record contained only a differential diagnosis of Parsonage Turner syndrome, radial nerve palsy, or brachial plexitis. (*Id.*). Therefore, the ALJ found that such conditions were not medically determinable impairments, and even if they were found to be so, they would constitute at most only a slight abnormality that could not reasonably be expected to produce more than minimal, if any, work-related limitations. Thus, they would be non-severe impairments. (*Id.*). The ALJ concluded that Claimant did not have an impairment or combination of impairments that significantly limited (or were expected to significantly limit) the ability to perform basic work activities for 12 consecutive months; consequently, she found at step two of the analysis that Claimant was not disabled under the Social Security Act from the alleged onset of disability, November 1, 2008, through the date of the prior ALJ's decision, March 30, 2010, and was not entitled to benefits. (Tr. at 23-32, Finding Nos. 4 and 5).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises two related challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to follow the "slight abnormality" standard in finding that he had no severe impairments prior to December 31, 2012. (ECF No. 12 at 7). He argues that he "produced evidence to meet the *de minimis* standard at step two, and in the absence of a clear indication otherwise, the ALJ was compelled by SSR 85-28 to continue through the remaining steps of the sequential process." (*Id.* at 9). Claimant argues that the ALJ's failure to consider any of his impairments to be severe was not a harmless error, as the ALJ "quite obviously did not consider any limitations for [Claimant's] amputated left upper extremity or his functionally limited right upper extremity at any point in her decision, and instead, ended her analysis at step two." (*Id.* at 9). Claimant asserts that even with removal of the disputed evidence submitted by his prior attorney, the totality of the record supports that he met the 12-month durational requirement, at least for his amputated arm and his remaining hand, which was significantly functionally compromised after an injury in July 2009. (*Id.* at 10).

In his second challenge, Claimant argues that the ALJ inappropriately failed to consider evidence created after the prior ALJ's decision, which related back to his previously alleged impairments. (*Id.* at 10). Specifically, the ALJ "discarded" evidence related to Claimant's "right carpal tunnel syndrome and right wrist dysfunction," which corroborated his claim that these impairments continued for a period in excess of twelve months and had more than a minimal impact on his ability to perform work activities. (*Id.* at 11). Claimant argues that the ALJ refused to consider any of evidence created after his date last insured, regardless of its applicability, "including clinical observations that [Claimant] had good range of motion but with significant discomfort." (*Id.*).

In response, the Commissioner asserts that substantial evidence supports the ALJ's analysis and finding that Claimant did not have any severe impairments. The Commissioner states that the ALJ relied on the fact that Claimant had worked for years with his prosthetic left arm and continued to work until mid-July 2009, which was months after his alleged onset date. (ECF No. 13 at 10-11). Further, the Commissioner highlights the ALJ's finding that, although Claimant injured his right wrist and forearm in July 2009, his condition improved with conservative treatment despite his failure to participate in the recommended physical therapy. (*Id.* at 11). The Commissioner also emphasizes the ALJ's finding that Claimant did not receive treatment from December 30, 2009 until 2014; therefore, the Commissioner argues that the ALJ correctly found that Claimant's impairments did not last and were not expected to last for a continuous 12-month period. (*Id.* at 11-12). Contrary to Claimant's contention, the Commissioner argues that treatment resuming in 2014 does not permit an inference of linkage with Claimant's condition before his date last insured. (*Id.* at 12).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The information most relevant to Claimant's challenges is summarized as follows.

### A. Treatment Records

On July 11, 2009, Claimant presented to the Emergency Department at Williamson Memorial Hospital. (Tr. at 344-347). He stated that he fell at home two days earlier and was experiencing pain in his right wrist, hand, and forearm that he rated 8 on a 10-point pain scale. He described the pain as "aching" and reported that it was exacerbated by movement and relieved by nothing. (*Id.*). On examination, Claimant had

9

minimal swelling and his distal pulses were intact, but he had moderate tenderness to palpation in his right forearm and wrist. An x-ray showed no acute fracture. (Tr. at 347, 349-51). The clinical impression was ligamentous sprain of the right wrist. (Tr. at 347). Claimant was discharged the same day with a prescription for Diclofenac DR to take as needed every 12 hours for pain, and his right arm was placed in a sling immobilization device. (Tr. at 347-48).

Two days later, on July 13, 2009, Claimant presented to the Emergency Department at Appalachian Regional Healthcare, Inc. for follow up regarding his right hand injury. (Tr. at 356). He exhibited decreased motion in his hand, but no swelling or pain on motion. (*Id.*). Claimant had pain on palpation in his right wrist and limited extension in his right arm tendons, but no nerve deficits. (*Id.*). An x-ray of his right wrist and hand showed no fracture or arthritis and satisfactory alignment. (Tr. at 355). He still rated his pain as 8 out of 10. (Tr. at 358). Claimant subsequently participated in a motor nerve conduction velocity study on July 15, 2009 performed by William E. Nichols, Jr., D.C., at M and G Neurophysiology. (Tr. at 368). The study's primary purpose was to investigate Claimant's complaints of significant numbness in digits D1-3 of his right hand, as well as significant wrist and finger weakness. (*Id.*). The results of the study were normal. (Tr. at 369).

On July 29, 2009, Claimant presented to board-certified neurologist, Sujata R. Gutti, M.D., at the Pikeville Neurology Clinic. (Tr. at 461). Nancy Casey, Claimant's family nurse practitioner, arranged the consultation for the purpose of evaluating Claimant's reported right arm weakness. (*Id.*). On examination, Claimant could not extend his wrist and had difficulty making a fist. (*Id.*). He described numbness, tingling, and a burning sensation in his right thumb and index finger. (*Id.*). He also reported some

10

tingling and burning that extended to the extensor aspect of his right forearm. (*Id.*). At that time, the muscle strength of Claimant's wrist extensors was 0 out of 5, finger extensors was 2 out of 5, and finger flexors was 4+ out of 5, although he had good muscle strength on the proximal radial nerve distributed muscles.[2] (Tr. at 462-63). Dr. Gutti found that Claimant's symptoms suggested underlying radial nerve involvement, probably in the spiral groove. (*Id.*). He ordered a nerve conduction/needle electromyography test and reviewed the results, confirming that the findings were consistent with moderately severe right radial nerve entrapment across the spiral groove. (Tr. at 397). The studies also showed that Claimant had right median nerve entrapment distally, which was also moderately severe and was consistent with carpal tunnel syndrome. (*Id.*).

On August 14, 2009, Claimant was referred by Nurse Casey to Warren C. Breidenbach, M.D., at the Kleinert Kutz Hand Care Center in Louisville. Kentucky. (Tr. at 394). Dr. Breidenbach noted that Claimant had lost his left arm following an accident at three years of age and then injured his right hand in July 2009. (Tr. at 393). Claimant reported having some tenderness immediately after falling on his right hand, but nothing marked. (*Id.*). However, Claimant related that in a matter of days, he awoke with wrist drop and was unable to extend his wrist or fingers.[3] (*Id.*; Tr. at 394). On examination by Dr. Breidenbach, Claimant exhibited complete paralysis of the brachial

---

[2] Muscle strength is generally rated on the following five-point scale: 0/5: no contraction; 1/5: muscle flicker, but no movement; 2/5: movement possible, but not against gravity; 3/5: movement possible against gravity, but not against resistance by the examiner; 4/5: movement possible against some resistance by the examiner (sometimes this category is subdivided further into 4−/5, 4/5, and 4+/5); and 5/5: normal strength. http://www.neuroexam.com/neuroexam/content29.html

[3] Wrist drop is when a person's wrist hangs down flaccidly and the person cannot extend (lift) it. https://www.drugs.com/cg/radial-nerve-palsy.html

radialis and mobile wad and was therefore unable to extend his right wrist or four fingers on his right hand. (*Id.*). He also showed weakness on flexion, in the abductor of his right thumb, and in his extrinsic muscles.[4] (*Id.*). Dr. Breidenbach felt that Parsonage Turner syndrome was the most likely diagnosis, adding that if Claimant's palsy resulted from a direct trauma to the nerve, it likely would not have taken over a day to present itself.[5] (*Id.*). Claimant was provided a "cockup splint" and sent to Vasudeva Iyer, M.D., at the Neurodiagnostic Center for an immediate needle electromyography (EMG).[6]

The EMG showed marked weakness in Claimant's muscles supplied by the right radial nerve with the exception of the triceps. (Tr. at 360, 363). Claimant also had total sensory loss in the muscles supplied by the radial nerve distal to the triceps. (*Id.*). His results were suggestive of right radial nerve neuropathy below the spiral groove. (Tr. at 360). There was also evidence of significant axonal involvement with no reinnervation changes. (*Id.*). Dr. Iyer suggested repeating the study in 6 to 8 weeks to assess his

---

[4] Extrinsic muscles "arise outside of, but act on, the structure under consideration. For example, those muscles operating the hand but having fleshy bellies located in the forearm." http://www.medilexicon.com/dictionary/56745

[5] "Parsonage-Turner syndrome (PTS) is an uncommon neurological disorder characterized by rapid onset of severe pain in the shoulder and arm. This acute phase may last for a few hours to a few weeks and is followed by wasting and weakness of the muscles (amyotrophy) in the affected areas. PTS involves mainly the brachial plexus, the networks of nerves that extend from the spine through the neck, into each armpit and down the arms. These nerves control movements and sensations in the shoulders, arms, elbows, hands, and wrists. The exact cause of PTS is unknown, but it is believed to be caused by an abnormality of the immune system (immune-mediated disorder). The severity of the disorder can vary widely from one individual to another due, in part, to the specific nerves involved. Affected individuals may recover without treatment, meaning that strength returns to the affected muscles and pain goes away. However, individuals may experience recurrent episodes. Some affected individuals may experience residual pain and potentially significant disability." https://rarediseases.org/rare-diseases/parsonage-turner-syndrome/

[6] "Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons) [...] During a needle EMG, a needle electrode inserted directly into a muscle records the electrical activity in that muscle." http://www.mayoclinic.org/tests-procedures/emg/basics/definition/prc-20014183

prognosis. (*Id.*). In the meantime, Dr. Iyer recommended that Claimant begin physical therapy, including electrical stimulation of the affected muscles. (Tr. at 363).

Claimant returned to Dr. Breidenbach for a second time on August 14, 2009 following his EMG. (Tr. at 393-94). On examination, Claimant had paralysis of the brachial radialis and mobile wad with complete extension paralysis. Claimant's flexion, thumb abductor, and intrinsics were weak. Dr. Breidenbach reviewed the results of Dr. Iyer's EMG and concluded that Claimant's paralysis only affected his radial nerve and was located at the groove. Overall, Dr. Breidenbach found that the results of the testing made it more difficult to determine whether Claimant had Parsonage Turner syndrome, a direct injury to his radial nerve, or a brachial plexitis. The plan was to fit Claimant for an "orthoplast out-rigger" and reevaluate him in two months. Claimant was issued the right wrist brace four days later on August 18, 2009. (Tr. at 371). He was instructed to wear it during the day for stability and protection. (*Id.*).

On September 10, 2009, Claimant presented for his third of three monthly visits at Holistic Medical LLC. (Tr. at 386, 391). He complained of pain in his right hand, right shoulder, neck, and back. He also reported a headache. He stated that his pain was moderate, which he rated at 5 out of 10, and chronic. (Tr. at 391). His diagnosis was, in relevant part, carpal tunnel syndrome/muscle atrophy in his right upper extremity. (Tr. at 386).

On October 9, 2009, Claimant followed up with Dr. Breidenbach. He could fully extend his fingers and wrist, so that aspect of his condition was much improved. (Tr. at 439). He reported wearing the wrist brace on most nights. (*Id.*). Claimant's radial nerve was intact, but he had reduced motor grade of 3 out of 5 in his Abductor Pollicis Brevis

(APB)[7] and 4 out of 5 in his intrinsic muscles. (*Id.*). He was to continue to wear his brace at night and start physical therapy. (Tr. at 440).

On December 30, 2009, Claimant followed up with Dr. Gutti. He complained of continued weakness in his right wrist, finger extensor, hand, and arm; pain in his right arm and forearm; and numbness in the dorsum of his right hand and extensor aspect of his forearm. (Tr. at 459). He was currently taking Lortab and Neurontin. (*Id.*). On examination, he had right wrist drop and his motor strength was 2 out of 5 in his right wrist extensor, 3 out of 5 in his right finger extensors, and 4+ out of 5 in his triceps. (*Id.*). His deep tendon reflexes were 1+ in his right upper extremity.[8] He had decreased sensation on the right dorsum of his hand, right index finger, and thumb. (*Id.*). The impression was right wrist drop with the radial nerve entrapment across the spiral groove and right carpal tunnel syndrome. (*Id.*). The plan was to repeat the nerve conduction and EMG studies, increase Neurontin for neuropathic pain, and undergo physical therapy for muscle strengthening. (*Id.*).

The next relevant treatment record in evidence was prepared over three years later, on June 3, 2014, and documents a visit by Claimant to Appalachian Regional Healthcare. (Tr. at 627-28, 639). Claimant reported pain in his left shoulder and upper extremity stump at the site of his amputation. (Tr. at 627). He stated that he had chronic pain in those areas since he was hit by a car and his left arm was amputated in 1974; however, the pain had increased in the past two years. (*Id.*). Claimant also reported

---

[7] The APB is located in the hand between the wrist and the base of the thumb; its main function is to abduct the thumb, or move it away from the palm. http://www.healthline.com/human-body-maps/abductor-pollicis-brevis-muscle

[8] The grade 1+ indicates "a slight but definitely present response" that "may or may not be normal." https://www.ncbi.nlm.nih.gov/books/NBK396/

being diagnosed by a University of Kentucky physician with radial nerve/median nerve and ulnar nerve injury, resulting in right hand numbness more prominent in the lateral half of his hand in the palmar area. After an examination, Claimant was diagnosed with chronic pain in several areas, including his left upper extremity stump and shoulder, and with carpal tunnel syndrome. For his chronic pain, Claimant was instructed to continue naproxen, Zanaflex, Neurontin, hydrocodone, and Tylenol. (Tr. at 628, 639). For his carpal tunnel syndrome, he was advised to wear a wrist splint, continue Neurontin, and he was referred to an orthopedist. (Tr. at 628, 639).

On June 1, 2015, Claimant saw certified nurse practitioner Aimee Colegrove. He stated that he could perform activities of daily living, but he could not work due to lumbar back pain and symptoms. (Tr. at 612). He reported intermittent right hand tingling, but had full range of motion, normal strength, and good use of his right arm. (Tr. at 613). However, a week later, on June 8, 2015, Claimant stated to Nurse Colegrove that his right wrist hurt with flexion and seemed to be getting worse lately. (Tr. at 610). He described it as "toothache type pain." (*Id.*). He still had good range of motion in his right wrist, but reported discomfort upon passive and active full flexion. (*Id.*).

On June 22, 2015, Claimant again saw Nurse Colegrove. He continued to have right wrist pain and was greatly concerned about losing "some of the use of his [right upper extremity]" as his left arm was amputated. (Tr. at 607). It was noted that Claimant had a positive carpal tunnel study prior to his right wrist injury. (*Id.*). He reported decreased wrist strength and increased pain with use; however, he had good range of motion and grip strength in his right upper extremity. (*Id.*). His extremities were warm, well perfused, and had no edema. (*Id.*). His diagnosis was pain in his right wrist. (Tr. at 608).

On October 19, 2015, Claimant saw Nurse Colegrove. He was still on Neurontin for carpal tunnel syndrome in his right arm. (Tr. at 602). Claimant's diagnosis of carpal tunnel syndrome in his right extremity was again noted during Claimant's visit with Nurse Colegrove on January 15, 2016. (Tr. at 601).

### B. Evaluations and Opinions

On July 6, 2009, non-examining state agency expert Rabah Boukhemis, M.D., found insufficient evidence in the record to evaluate Claimant's RFC. (Tr. at 342). Dr. Boukhemis noted that Claimant missed his clinical evaluation appointment scheduled on June 23, 2009 and did not return his activities of daily living and personal pain questionnaire forms. (*Id.*).

On August 19, 2009, Claimant applied for workers' compensation benefits. (Tr. at 417). Claimant stated that on July 11, 2009 at 3:00 p.m., he slipped and fell on his wrist after climbing down from a bulldozer at work. (Tr. at 377). He asserted that his wrist and radial nerve was injured and he first sought treatment on July 13, 2009 at Appalachian Regional Hospital. (Tr. at 378). He was awarded temporary disability benefits from July 29, 2009 through February 29, 2010. (Tr. at 401).

On December 11, 2009, Dr. Breidenbach completed a form for the workers' compensation insurance carrier stating that he examined Claimant a week prior and found that Claimant was "somewhat improved." (Tr. at 450). He opined that Claimant could return to light level work. (*Id.*). Shortly thereafter, on December 30, 2009, Claimant's treating neurologist, Dr. Gutti, opined during a regular follow-up examination that Claimant was totally disabled from any work due to right wrist drop and right carpal tunnel syndrome. (Tr. at 459).

### C.  Claimant's Statements

On August 31, 2009, Claimant completed a pain questionnaire and described his wrist pain. (Tr. at 245-46). He stated that the pain was continuous and persisted all day, and manifested as aching and cramping. He attributed the pain to Parsonage Turner Syndrome/radial nerve compression. Claimant took Lortab to relieve the pain, and felt that sleep also helped with pain relief. As far as the functional effects of his wrist impairment, Claimant indicated that he could no longer dress himself or shave, eat certain foods, and drive without assistance. (Tr. at 250-57). Claimant explained that because he only had one arm, he could not lift skillets, pots, or pans; tie shoes; bathe; write; or handle money.

At the administrative hearing in March 2016, Claimant testified that he did not drive, because he lacked confidence in his only hand to operate the vehicle safely. (Tr. at 44-56). He discussed losing his left arm in 1974, stating that he had used a prosthetic arm after the amputation. Claimant provided a history of working as a forklift driver and a heavy equipment operator. He testified that after injuring his remaining hand in 2009, he was unable to pick up, hold, and manipulate objects. His condition had gradually improved over time, but he still had limitations in using his right hand. For example, Claimant stated that he was unable to connect his prosthetic arm to his stump without assistance, had trouble with belt buckles, and could not drive. He was comfortable lifting and carrying about five pounds, but no more. When asked why he had not agreed to undergo available surgical treatment to improve the use of his right hand, Claimant testified that no one could guarantee him a favorable outcome, and he was afraid to take the chance given that he only had one hand.

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

Claimant challenges the ALJ's finding that his status post left arm amputation and right wrist injury/carpal tunnel syndrome were non-severe impairments. (ECF No. 12). At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§

18

404.1522(a), 416.922(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include physical functions such as lifting, pushing, pulling, reaching, carrying, and handling. 20 C.F.R. §§ 404.1522(b), 416.922(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. In addition, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. §§ 404.1509, 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

19

In this case, the ALJ found at step two that Claimant had medically determinable impairments of "status post left arm amputation; right wrist drop with the radial nerve entrapment across the spiral groove; right carpal tunnel syndrome, and major depressive disorder"; however, the ALJ determined that these impairments were non-severe. (Tr. at 22). In support of that conclusion, the ALJ explained that the conditions were "responsive to treatment, caused no more than minimal vocationally related limitations, did not last or were not expected to last at a "severe" level for a continuous period of 12 months, or were not expected to result in death [...]" (Tr. at 23).

Regarding Claimant's amputated left arm, the ALJ found that this impairment did not produce more than minimal vocationally related limitations because Claimant had worked without his left arm in the past, and "there was no complaint or evidence of this condition worsening during the relevant period." (Tr. at 23, 25). As this reasoning clearly indicates, the ALJ conflated Claimant's functional capacity with the severity assessment made at step two of the process. Moreover, the explanation given by the ALJ is specious. Claimant's ability to perform work despite having an amputated arm does not mean that the absence of his limb is only "a slight abnormality [...] that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1. Indeed, Claimant's past job as an equipment operator might have required very limited use of his left prosthetic arm, or he might have received certain work accommodations to account for any limitations that he suffered due to his amputation.

The step two inquiry is "not a difficult hurdle for the claimant to clear." *Peterson ex rel. H.B. v. Astrue*, No. 7:10-CV-39-FL, 2011 WL 285564, at *3 (E.D.N.C. Jan. 26, 2011) (citing *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473, 474 n. 1 (4th Cir.1999)). As stated above, it is merely a *de minimis* screening device designed to

dispose of groundless claims. *Felton–Miller,* 459 F. App'x at 230. "[I]f, after completing development and considering all of the evidence, the adjudicator is unable to determine clearly the effect of an impairment(s) on the individual's ability to do basic work activities, the adjudicator must continue to follow the sequential evaluation process until a determination or decision about disability can be reached." SSR 96-3P, 1996 WL 374181 at *2.

The ALJ's decision fails to articulate substantial support for her finding that Claimant's amputated left arm was only a *slight abnormality* that had no more than a *minimal effect* on his ability to perform such activities as lifting, pushing, pulling, reaching, carrying, and handling items. The ALJ did not analyze Claimant's ability to perform these functions with his prosthetic left arm, nor did she consider whether Claimant's other medically determinable impairments, when combined with the missing limb, affected his functional abilities. Lacking substantial evidence to the contrary, common sense dictates a finding that Claimant's amputation had more than a *minimal* effect on his ability to perform basic work functions that required the use of his upper extremities. Certainly, such a finding is consistent with a number of opinions in which the amputation of an arm was assessed at step two of the disability process. *See, e.g., Thomas v. Comm'r, Soc. Sec. Admin.,* No. CIV. SAG-11-3683, 2013 WL 66538, at *1 (D. Md. Jan. 2, 2013); *Kilpatrick v. Berryhill,* No. 1:16-CV-01014, 2017 WL 1197833, at *1 (W.D. Ark. Mar. 30, 2017); *Migliore v. Colvin,* No. 1:15-CV-00638-JLT, 2016 WL 8730737, at *7 (E.D. Cal. Aug. 26, 2016); *Valles v. Colvin,* No. EDCV 15-0432 (KS), 2016 WL 1626812, at *1 (C.D. Cal. Apr. 21, 2016); *Isom v. Soc. Sec. Admin.,* No. CV 14-2620, 2016 WL 3448157, at *1 (E.D. La. June 22, 2016); *McNabb v. Colvin,* No. 4:14-CV-380 NAB, 2015 WL 357111, at *12 (E.D. Mo. Jan. 27, 2015); *Hartley v. Colvin,* No. 1:13-CV-

02247-MC, 2015 WL 510952, at *4 (D. Or. Feb. 6, 2015); *Woods v. Colvin*, No. CIV.A. H-13-120, 2014 WL 2593138, at *5 (S.D. Tex. June 10, 2014); *York v. Colvin*, No. CIV.A. 12-00023-B, 2013 WL 1334913, at *3 (S.D. Ala. Mar. 29, 2013); *Reynolds v. Astrue*, No. 5:08-CV-123-OC-GRJ, 2009 WL 1151780, at *5 (M.D. Fla. Apr. 28, 2009); *Allen v. Astrue*, No. CIV A 07CV01878-RPM, 2009 WL 482563, at *1 (D. Colo. Feb. 25, 2009); *Swentko v. Astrue*, No. 2:07CV280, 2008 WL 2857986, at *4 (W.D. Pa. July 21, 2008); *Yang v. Astrue*, No. CIVS-06-2658 EFB, 2008 WL 802321, at *1 (E.D. Cal. Mar. 25, 2008); and *Chavez v. Apfel*, No. 2:98-CV-126, 2001 WL 169732, at *2 (N.D. Tex. Jan. 17, 2001).

Moreover, if the ALJ determined that Claimant's status post amputation of his left arm did not significantly affect his ability to perform basic work functions, she should have substantively explained the evidentiary basis for that finding, rather than simply concluding that Claimant's prior work experience, *ipso facto,* made it so. For instance, the ALJ could have, perhaps, utilized the services of a vocational expert (VE) to explain whether or not Claimant's impairment imposed vocationally related limitations. *Cf. Thompson v. Astrue*, No. CIV.A. 5:07-CV-00741, 2009 WL 817330, at *4 (S.D.W. Va. Mar. 27, 2009) (Finding that "the VE's testimony combined with the types of activities in which Plaintiff engages constitutes substantial evidence to support the Commissioner's finding that Plaintiff's blindness in one eye is not a severe impairment."); *Lickenfelt v. Astrue*, No. CIV.A. 07-0958, 2008 WL 2275538, at *8 (W.D. Pa. May 30, 2008) (Finding that the ALJ did not err at step two when "plaintiff continued to work for many years even after his partial amputation [and subsequent reattachment of his right arm], and the VE testified that even with limitations, plaintiff could still perform basic work activities."). The ALJ simply did not develop such

evidence. Overall, the ALJ did not provide adequate explanation, support, or analysis for her step two finding regarding Claimant's left arm. *See* SSR 96-3p, 1996 WL 374181, at *2 ("A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.").

Furthermore, the ALJ's error in this instance is not harmless, because she ended the sequential evaluation at step two and did not proceed to consider the effect of Claimant's amputated upper extremity on his ability to work, particularly in combination with his other impairments. *See Cook v. Colvin*, No. 2:15-CV-07181, 2016 WL 5661348, at *9 (S.D.W. Va. Sept. 29, 2016) (An error at step two is harmless only when the ALJ found at least one severe impairment, proceeded with the sequential evaluation, and considered the effect of the challenged impairment) (collecting cases); *Hammond v. Astrue*, No. CIV.A. TMD 11-2922, 2013 WL 822749, at *5 (D. Md. Mar. 5, 2013) (Reversing and remanding ALJ's decision where ALJ erroneously determined that spinal cord injury was non-severe at step two and the decision did not make clear that the ALJ considered the residual effects of the injury at subsequent steps of the evaluation). "[A]n error at step two may require reversal and remand where the ALJ improperly discounts or ignores evidence of the allegedly severe impairment at the other steps of the sequential analysis." *Hammond*, 2013 WL 822749, at *3. "For this reason [...] erroneous findings at step two usually infect the entire decision, since all of a claimant's impairments must be considered in combination at steps three, four and

five." *Id.* (citations and internal markings omitted).

The undersigned notes the ALJ's finding that the evidence of record establishes Claimant's capacity to perform light exertional level work; a finding made by the ALJ in the absence of a properly performed functional capacity evaluation. (Tr. at 29). The ALJ's decision does not show any consideration of the limitations attributed to Claimant's lack of a left arm, nor does it sufficiently explain why limitations on his ability to perform the full range of light work are unnecessary. *Cf. Thomas*, 2013 WL 66538, at *1 (The ALJ found that Claimant could perform light work despite his amputated left arm and other impairments except that he was limited to jobs that could be performed with one hand). However, more importantly, by suggesting that Claimant's RFC limited him to the light exertional level, the ALJ implicitly determined that Claimant was unable to perform his past relevant work, which was described as heavy labor. Accordingly, under the sequential evaluation process, Claimant established a *prima facie* case of disability, which then shifted the burden to the Commissioner to establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore*, 538 F.2d at 574. Obviously, this was not done.

The ALJ's foregoing step two error is compounded by her finding that Claimant's right upper extremity impairments were likewise non-severe. Namely, the ALJ failed to proceed with the analysis and consider how the effect of Claimant's amputated left arm, combined with the functional limitations, if any, of his right upper extremity impairments impacted his ability to work. The ALJ concluded that Claimant's right wrist drop with radial nerve entrapment across the spiral groove and right carpal

tunnel syndrome were non-severe impairments because Claimant's treatment was routine and conservative, including pain medication, and a brace to wear at night. (Tr. at 28). The ALJ also noted that surgical intervention was not recommended, although physical therapy was recommended and never obtained. (*Id.*). Further, the ALJ concluded that Claimant's impairments failed to satisfy the 12-month durational requirements of 20 C.F.R. §§ 404.1509, 416.909 because the first medical record in the file is dated April 2009 and Claimant sought no treatment after December 2009 until at least the year 2014. (Tr. at 25, 28, 30).

Despite substantial support for the ALJ's finding regarding Claimant's conservative treatment, the record reflects sufficient evidence to meet the minimal step two severity threshold regarding Claimant's right-handed nerve entrapment and carpal tunnel syndrome. C.F.R. §§ 404.1522(a), 416.921(a); SSR 96-3p, 1996 WL 374181, at *1. Claimant presented at the emergency room with a hand injury on July 11, 2009. (Tr. at 346). While he related conflicting stories as to how and where the injury occurred, his objective testing showed moderate right radial nerve entrapment across the spiral groove and moderate right median nerve entrapment distally, which was consistent with carpal tunnel syndrome. (Tr. at 397). By October 2009, although Claimant's hand and wrist paralysis improved to the point that he could fully extend his wrist and fingers, he still had reduced motor grade in his APB and intrinsic muscles. (Tr. at 439). Also, in December 2009, Claimant again had right wrist drop and limited motor strength in his wrist extensor, finger extensors, and triceps in his right upper extremity. (Tr. at 459). The impression was right wrist drop with radial nerve entrapment across the spiral groove and right carpal tunnel syndrome. (*Id.*). As correctly stated by the ALJ, Claimant did not produce any subsequent records of treatment until 2014. However, those records

reflected that Claimant's right carpal tunnel syndrome was still an active diagnosis for which he was prescribed Neurontin in 2014 and 2015. (Tr. at 601, 603, 639).

Contrary to the ALJ's finding, Claimant's records in 2014 and 2015 are informative of his condition during the relevant period. Specifically, such records demonstrate that the impairment met the 12-month duration requirement because Claimant's impairment indisputably did not resolve after December 2009. Under 20 C.F.R. §§ 404.1509, 416.909, Claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." Also, on redetermination, the SSA "will consider evidence that postdates the original date of the allowance if that evidence relates to the period at issue." SSR 16-1P, 2016 WL 1029284, at *5. Claimant's carpal tunnel syndrome clearly persisted in excess of twelve months notwithstanding the gap in treatment records. Therefore, the ALJ's finding that Claimant's impairment did not meet the durational requirement does not provide substantial support for her finding that the impairment was non-severe.

Overall, while the ALJ's decision provides a thorough analysis of Claimant's credibility and the weight that the ALJ assigned to various pieces of evidence regarding Claimant's right upper extremity, it provides an inadequate step two discussion of the impact of Claimant's right upper extremity impairments, particularly in combination with his amputated left arm. The ALJ simply failed to analyze the effect of Claimant's upper extremity impairments on his ability to perform basic work activities. Critically, the ALJ's decision overlooks the fact that even a minimal functional limitation regarding Claimant's right upper extremity could qualify as a severe impairment in combination with Claimant's status post left arm amputation. The ALJ did not develop and articulate her analysis of such considerations because she ended her inquiry at step two.

26

Therefore, for all of the reasons stated above, the undersigned **FINDS** that the ALJ's decision is not supported by substantial evidence. Thus, the undersigned **RECOMMENDS** that the ALJ's decision be reversed and the case remanded for further proceedings consistent with this PF&R.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for summary judgment, (ECF No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above

shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 29, 2017

Cheryl A. Eifert
United States Magistrate Judge